J. S34031/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPT. OF: K.R.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: B.M.L., NATURAL MOTHER | : | No. 584 MDA 2020 |

Appeal from the Order Entered March 17, 2020,
in the Court of Common Pleas of York County
Orphans' Court Division at No. 2019-0033a

BEFORE:  PANELLA, P.J., BENDER, P.J.E. AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED SEPTEMBER 28, 2020**

Appellant, B.M.L. ("Mother"), appeals from the order dated March 16, 2020 and entered on March 17, 2020, granting the petition filed by R.L.G., Jr., ("Paternal Grandfather") and V.G. ("Paternal Grandmother") (collectively, "Paternal Grandparents") to involuntarily terminate her parental rights to her male, special needs child, K.R.G. ("Child") (born in May of 2007), pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), so that Paternal Grandparents may adopt Child.[1]  We affirm.

On March 15, 2019, Paternal Grandparents filed a petition for adoption and a petition for the termination of Mother's parental rights regarding Child. On September 3, 2019, the trial court convened a hearing on the termination petition, but adjourned to allow Mother an opportunity to have

---

[1] R.L.G., III, Child's father and Paternal Grandparents' son, died in April of 2014.  (Trial court order, 3/17/20 at 2; notes of testimony, 10/10/19 at 38, 82.)

court-appointed counsel. (*See* trial court order, 3/17/20 at 1 n.1.) On September 9, 2019, the trial court appointed Attorney Jennifer Galloway to represent Mother. The trial court held evidentiary hearings on the termination petition on October 10, 2019 and February 13, 2020. At the hearings, Attorney Alexis Swope represented Paternal Grandparents, Attorney Galloway represented Mother, and Attorney Kelly McNaney represented Child as legal interests counsel and guardian *ad litem* ("GAL").[2]

At the hearing on October 10, 2019, Paternal Grandparents each testified. They also presented the testimony of K.G., their adult daughter. At

---

[2] At the time of the hearings Child was 12 years old, but he has special needs, having autism, and is non-verbal. *See In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (plurality), in which our supreme court held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interest of any child involved in a contested involuntary termination proceeding. The court defined a child's legal interest as synonymous with his or her preferred outcome. *See also In re T.S.*, 192 A.3d 1080 (Pa. 2018), in which our supreme court held that the trial court did not err in allowing the children's guardian *ad litem* to act as their sole representative during the termination proceeding because at two and three years old, they were incapable of expressing their preferred outcome. At the close of the hearing on February 13, 2020, Attorney Kelly McNaney, Child's legal interest counsel/GAL stated that she had seen Child in his home with Paternal Grandparents, where he is very comfortable, where all of his needs are being met. (Notes of testimony, 2/13/20 at 160.) He is in school and has a routine, and is doing well. *Id.* Attorney McNaney stated that the termination of Mother's parental rights is in Child's best interests. *Id.* We do not comment on the quality of her representation of Child. *See In re: Adoption of K.M.G.*, 219 A.3d 662, 669 (Pa.Super. 2019) (*en banc*) (filed September 13, 2019) (*limited appeal granted*, December 9, 2019) (holding that this court has authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation).

the hearing on February 13, 2020, Mother presented the testimony of Letisha Bemis, a methadone counselor at Pyramid HealthCare; W.F., Child's maternal grandmother ("Maternal Grandmother"); and E.K., Mother's significant other. Mother also testified on her own behalf. Maternal Grandmother also testified on her own behalf, and Mother's counsel cross-examined her.

In its termination order, based on the testimony and documentary evidence that the trial court found credible from the hearings, the court set forth the factual background and procedural history of this appeal as follows.

> The Child is autistic, having been diagnosed with Autism Spectrum Disorder at approximately fifteen months of age, and has special needs, including the need for round-the-clock care, assistance with activities of daily living (ADLs) and occupational therapy.
>
> Mother admits that she and Father became overwhelmed upon learning of this diagnosis and the [C]hild displaying developmental concerns such as limited verbal communication. Mother attributes such diagnosis as a precipitating factor in the parent's engagement in illicit substance use.
>
> After Mother and Father became involved in using illegal drugs, they separated in 2012[,] with Father having majority custody of the Child.
>
> On January 28, 2013, Father and the Paternal Grandmother entered into an agreement by which [the] Paternal Grandmother was given temporary custody of the Child at the Paternal Grandparents' home [in Dover, Pennsylvania,] with the Paternal Grandmother having Father's "permission to make all necessary decisions regarding (the Child's) health,

welfare, education, and all other aspects of his well-being during this time." [Petitioner's] P-Ex. 1.

Father died of a drug overdose [in April of 2014].

On April 25, 2013, York County Children, Youth and Families [("CYS")] created a Safety Plan by which the Paternal Grandmother agreed that the Child would "not have unsupervised contact with (the parents)" and "reside with (her) from Monday to Friday and with [W.F.] on the weekends." P-Ex. 2.

On April 27, 2013, Mother, [the] Paternal Grandmother and [Maternal Grandmother] entered into an Authorization for Temporary Guardianship of Minor by which Mother gave [the] Paternal Grandmother and [Maternal Grandmother] full rights of guardianship of the Child. P-Ex. 3.

On June 10, 2014, the Paternal Grandparents commenced a custody action in York County captioned as "[V.G. and R.G., Jr.] vs. [B.M.L.]" and docketed to File No. 2014-FC-001058-03. By Stipulated Order for Custody dated August 1, 2014, the Paternal Grandparents were awarded primary physical custody of the Child[,] with Mother having rights of partial physical custody[, and] with such rights being supervised by [Maternal Grandmother]. P-Ex. 6. Paternal Grandmother acknowledges Mother was living in a recovery house at the time and agreed to this custody arrangement so "she could get better."

[The] Paternal Grandparents have enjoyed custody of the Child since 2010 to present[,] with Mother seeing the Child "from time to time," but not with any consistency or in accordance with the Stipulated Order for Custody.

Except for one chance meeting during August of 2018, Mother has had no contact with the Child since June 2017. Mother did not send the Child any cards, letters or gifts or speak with the Child by phone or any other electronic means in the intervening timeframe.

Mother has never provided any financial support for the Child.

At all times relevant, Mother was able to contact [the] Paternal Grandparents, knowing their address and telephone number.

Mother has never contacted the Paternal Grandparents to make inquiry of the Child's well[-]being since June 2017.

The Paternal Grandparents never did anything to discourage Mother from being involved in the Child's life.

The Paternal Grandparents' daughter, [K.G.], has been actively involved in the Child's life during most of her lifetime, including seeing the Child daily through 2017 and approximately once per month since then after moving to the Baltimore[, Maryland,] area. The Child has become very attached to her . . . and "treats her almost as a mother at times." [**See** notes of testimony, 10/10/19 at 54.]

The Paternal Grandparents have provided the Child with a safe and stable environment that attends to [his] financial, emotional, educational and physical needs[,] and the Child has been thriving under their care and custody.

The Child has formed a strong emotional bond with the Paternal Grandparents, the prospective adoptive parents. The Child is affectionate with Paternal Grandmother[,] and their relationship is like a mother and child.

The Paternal Grandparents wish to adopt the Child for a host of good and valid reasons, including: a) having become the Child's parents and providers in Mother's absence; b) it being time for them to become the Child's parents legally; c) the Child's continuing need to have the safety, stability and routine, existing and being provided in their intact family unit; d) Mother not being a part of the Child's life; e) the Child not

really knowing [his] Mother; and (f) the fear of disruption, turmoil and harm to the Child if Mother is permitted to further process her efforts to regain custody of the Child.

Conversely, Mother opposes termination of her parental rights, being of the belief that the Child was placed in the care of [the] Paternal Grandparents only temporarily while she addressed her substance abuse problem, she knew the Child was being well[-]cared for in her absence, and now, after treatment, she is positioned to re[-]acquaint herself and become involved in the Child's life as his mother.

Mother articulated her intent to reconcile in the threat of harm report dated February 23, 2019 by stating that, "her future goal with (the Child) is to be involved with his life but to avoid any major disruption due to his diagnosis of Autism." [*Id.* at 128.]

Mother testified her criminal record is the product of a substance abuse problem, she has participated in prison and in-patient treatment programs in an effort to cure the problem, and she has been "clean" for the last four years, except for a relapse in April 2018 when she entered White Deer Run for inpatient detoxification.

Mother believes she was "blocked" from contacting the Paternal Grandparents in an effort to reestablish a relationship with the Child despite acknowledging never making any attempt to do so. Mother gave two explanations for such belief: a) [the] Paternal Grandmother blocked her from communicating with her on Facebook, which circumstance occurred prior to Father's death in 2014; and b) [the] Paternal Grandfather posted some derogatory comments about her on Facebook, nothing more.

As of February 2019, Mother admitted in the threat of harm report that she had not "seen (the Child) in approximately one year." [*Id.* at 127.] Mother further stated in the report that, "she does not want

to interrupt (the Child's) life, as 'routine seems really important to him; I think that's what he needs'." [*Id.*]

During that same timeframe, Mother reported being actively involved with her significant other's daughter, [I.M.K.], age 3, and "enjoy(ing) family activities such as going to Tumble Town and playing My Little Pony with [I.M.K.]," with [I.M.K.] having become so attached to Mother that she calls her "mommy" and "display(s) separation anxiety from (other) adults." Mother further reported that [I.M.K.] "is everything to (her)."

Mother has been incarcerated during the Child's lifetime at the York County Prison for sentences imposed at Docket Nos: CP-67-CR-0004226-2013 and CP-67-CR-0007740-2013 as follows:

a.  From June 21, 2013 to July 3, 2013 – 13 days.

b.  From July 12, 2013 to August 3, 2013 - 23 days.

c.  From May 23, 2014 to July 9, 2014 - 48 days.

d.  From October 22, 2014 to November 3, 2014 - 13 days.

e.  From July 1, 2015 to November 20, 2015. [sic] - 143 days.

f.  From December 28, 2015 to January 18, 2016 - 22 days.

g.  From April 7, 2016 to April 21, 2016 - 15 days.

h.  From August 19, 2017 to November 6, 2017 - 80 days.

i.  From November 24, 2018 to February 21, 2019 - 90 days.

j.   TOTAL - 447 days during the Child's lifetime, 170 since 2017.

Mother was admitted onto [sic] Drug Treatment Court on October 27, 2015 and [was] discharged unsuccessfully on April 21, 2016.

Mother had the following **Gagnon** hearings: July 9, 2014; May 24, 2016; August 30, 2016; December 6, 2016; and April 3, 2017.

Mother plead guilty to shoplifting for an incident that occurred in November 2018.

Mother is currently on non-reporting probation.

Mother's relational history is as follows:

a.   Prior to the Child's birth, she was in a relationship with the Child's [f]ather, [R.L.G.], III.   Mother reports that "incidents of physical abuse with [R.L.G., III,] began to occur with more frequency during (the final four years of their relationship)."   The parents separated in 2012[,] and [R.L.G., III,] died in 2014.

b.   Mother thereafter met and became involved with [I.Q.-S.], whom she married [in August of 2016 and divorced in July of 2019].   During the latter stage of Mother's relationship with her former spouse, "increasing physical altercations between the two began to occur on a more frequent basis."

c.   In January 2019, Mother became involved and began residing with [E.K.], with whom she continues to reside.   There have been no reports of physical altercations or abuse to date.

- 8 -

Mother's treatment history is as follows:

a. In 2013, Mother entered inpatient detoxification and rehabilitation services for opiate use at White Deer Run in York, Pennsylvania.

b. In 2014, Mother returned to the White Deer Run inpatient facility for detoxification for 21 days followed by residential services at a local recovery house upon discharge. She report [sic] admitting herself to White Deer Run for one or two other detoxification treatment episodes from 2014-2016.

c. In April 2018, she entered White Deer Run again for detoxification services due to opiate use. Mother then enrolled in the Pyramid Methadone Maintenance Program subsequent to discharge.

d. At present, Mother is receiving counseling treatment from Pyramid Healthcare, Inc. Outpatient Treatment Center.

Earlier this year, Mother completed a formal parenting class and started watching videos regarding information on Autism Spectrum Disorder to be better able to relate to the Child.

Latisha Bemis, Mother's methadone counselor, testified that: a) she has known Mother since July 2018; b) there was a gap in treatment due to incarceration[,] with Mother being discharged from the methadone program on December 26, 2018 and re[-]admitted on January 22, 2019; c) Mother is subject to random drug screens and has been fully compliant in treatment since re[-]admission; and d) during counseling, Mother has articulated reconciliation with the Child as being one of her goals since January 2019.

[W.F.], the Maternal Grandmother, testified she initially had the typical grandmother involvement with the Child[,] with both Mother and Father being doting parents. After the parents separated due to suffering from substance abuse issues, however, custody occurred as follows: in 2012, custody went back and forth between the parents and the Paternal Grandparents; as of April 2013, [the] Paternal Grandparents had the Child full[-]time and Maternal Grandmother exercised weekend custody[,] with Mother often being present, but that arrangement lasted only briefly, maybe 3-4 times; thereafter, she recalls Mother sometimes being allowed to have custody of the Child on her own for babysitting purposes, which stopped over three years ago when the Paternal Grandparents no longer needed childcare. She acknowledges having no contact with the Child during the last three years, explaining that she initially backed off to care for her husband's health issues and having a busy work schedule. She explained that she never attempted to renew her relationship with the Child due to some unexplained "contention," but she would like to stay involved in the Child's life. She and Mother discussed bringing an action for custody, but they could not afford to pursue it. She acknowledges that [the] Paternal Grandmother has taken excellent care of the Child.

[E.K.], Mother's significant other, testified that: a) she and Mother have been in a relationship for two years; b) Mother is actively engaged in constructive steps of her recovery; c) the methadone program is working; c) Mother discussed reconciliation with the Child as a goal, but wanted to "sort our [sic] probation" and "make sure everything (was) stable before (the Child) came back into their lives" [notes of testimony, 10/10/19 at 145;] and d) she and Mother decided as a couple that [E.K.] would retain counsel and pursue custody of [I.M.K.], which custody action was not settled as of May 2019, before Mother would pursue custody of and reconciliation with the Child.

Trial court order, 3/17/20 at 2-11 (paragraph numbers omitted; footnotes omitted; emphasis in original).

On March 17, the trial court entered the order that terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), so that Paternal Grandparents may adopt Child. On March 30, 2020, the trial court entered a clarification order providing that Attorney Galloway's representation of Mother continued through any appeals.

On April 3, 2020, Mother filed a notice of appeal, along with a statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In her brief on appeal, Mother raises three issues, as follows:

1.  Whether the lower court erred in finding that Mother evidenced a settled purpose of relinquishing her parental claim to the child and failed or refused to perform parental duties towards the child for a period in excess of six months preceding the petition.

2.  Whether the trial court erred in failing to give appropriate weight and consideration to obstacles placed in the path of Mother which impacted her ability to exercise parental duties for the child.

3.  Whether the trial court erred in finding that the best interest of the child would be served by terminating Appellant's parental rights.

Mother's brief at 4.[3]

We will consider Mother's first two issues together, as they are interrelated and concern whether the trial court erred or abused its discretion in terminating her parental rights under Section 2511(a)(1). With regard to her first issue, Mother contends that the trial court failed to adequately consider her diligent and reasonable efforts to resume her parental duties after she was in a more stable position to resume them. Mother asserts that it is evident from the testimony that she has never stopped caring about Child. Mother claims that she has taken steps to obtain and maintain her sobriety, to get herself into a safe and stable relationship and home, to educate herself on how to raise a child with autism, and to position herself to resume her place in the life of her child. Mother states that she has never ceased doing what was required to get herself into a position to safely and fully exercise custody of Child. Mother asserts that she never relinquished her parental responsibility on a permanent basis. Rather, Mother claims that she relied on Child's maternal and paternal grandparents to help with the exercise of parental duties while she was either using drugs, incarcerated, or completing the process of getting herself to a safe and stable position to perform her parental duties. Mother states that the trial court failed to consider her sincere concern

---

[3] We note that Mother stated her issues somewhat differently in her concise statement, but we, nevertheless, find them sufficiently preserved for our review.

and concentrated effort to exercise her parental duties within the six-month statutory time period. (Mother's brief at 10, 14-20.)

Mother argues that the trial court failed to properly consider her explanation for her conduct of temporarily placing the majority of her parental duties with Paternal Grandparents. (*Id.* at 20-22.) Mother asserts that both she and Father abused drugs and relied heavily on assistance and support from both the Child's maternal and paternal grandparents. Mother suggests that her willingness to allow Paternal Grandparents to continue to provide care for Child while she was incarcerated was "only natural." Mother asserts that, when she was released from incarceration, she had no reason to believe that Paternal Grandparents would do anything more than continue to care for Child as she continued to get sober, and to secure a safe and stable home and relationship. Mother states that she planned to resume her parental responsibilities when she was in a position to do so.

Moreover, with regard to her second issue, Mother asserts that she also faced Paternal Grandparents' sentiment that she was not needed in their lives and was "no good." Mother claims that her feelings from Paternal Grandparents' sentiments about her, coupled with Child having autism and being a special needs child, "prevented [her] from initiating a custody action or jumping in to snatch her son out of the hands of [Paternal Grandparents] without an amicable transition." (*Id.* at 10-11.) Mother alleges that Paternal Grandparents filed the termination petition at approximately the time that she

believed she was fit to perform her parental duties and was prepared to file a custody action against Paternal Grandparents "to regain her parenting responsibilities." (*Id.* at 11-12.) Mother asserts that the trial court failed to properly accept her explanation for her conduct in not initiating a custody action sooner or not taking other action to more fully assert herself into the lives of Paternal Grandparents to interrupt their exclusive exercise of custody of Child. (*Id.* at 12-13.)

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-

> specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa.Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.***, quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa.Super. 2003).

This court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (***en banc***). Section 2511(a)(1) and (b) provides as follows:

### § 2511.  Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1) and (b).

With respect to Subsection 2511(a)(1), our supreme court has held as follows.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect

of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this court has stated:

> [t]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.
>
> . . . .
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.
>
> . . . .
>
> Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his

> relationship with his child, even in difficult
> circumstances. A parent has a duty to exert himself,
> to take and maintain a place of importance in the
> child's life.

***In re B.,N.M.***, 856 A.2d 847, 854-856 (Pa.Super. 2004) (citations omitted).

The trial court stated the following with regard to Mother's arguments regarding Section 2511(a)(1):

> Mother has not communicated with the Child either
> directly or via telephone, mail or any other means.
> There is no evidence Mother sent the [C]hild any gifts,
> presents, cards or letters. In short, Mother
> consistently has failed to maintain contact with the
> Child.
>
> She, likewise, has not used the means available to her
> to attempt to overcome any obstacles, imagined or
> otherwise, impeding her relationship with him. For
> instance, the [trial court] is unpersuaded by Mother's
> claim she was being "blocked" by the Paternal
> Grandparents from reconciling with the [C]hild[,] as
> there is no competent evidence of record to support
> such conclusion. Mother never contacted the Paternal
> Grandparents to initiate contact. Mother even drove
> by the Paternal Grandparents' residence in the
> company of E.K., but never stopped to visit. Despite
> periods of incarceration and in-patient treatment,
> Mother never reached out to communicate with the
> Child at all. Likewise, Mother had no contact with
> [the] Child during the period of time she was not in
> jail, with Mother not otherwise attempting to contact
> [the] Child.
>
> Mother's explanation for her conduct is woefully
> inadequate. The argument that she needed to recover
> from her opiate addiction before being a true mother
> to the Child is belied by the significant evidence of
> record that at times she was not incarcerated or in
> treatment, she chose to spend her time developing a
> significant relationship with [E.K.'s] child, [I.M.K.],
> instead. Even as of late February 2019, a few weeks

>before the pending petition was filed, Mother was still referring to her desire to reconcile with the Child as nothing more than an altruistic goal she was still contemplating.
>
>Mother's post-abandonment contact between parent and child is all but nonexistent. Other than the singular chance encounter in August of 2018, Mother has had no contact with the Child since June of 2017.
>
>With respect to Section 2511(a)(1), therefore, the [trial court] concludes that Mother[,] by clear and convincing evidence of conduct continuing for a period of at least six months immediately preceding the filing of the petition[,] has evidenced a settled purpose of relinquishing her parental claim to the Child and has refused and failed to perform her parental duties. 23 Pa.C.S.A. § 2511.

Trial court order, 3/17/20 at 14-15 (paragraph numbers omitted).

Upon review, we conclude that there is competent evidence in the record that supports the trial court's conclusion that Mother evidenced a settled purpose of relinquishing parental claim to Child or has refused or failed to perform parental duties in the six-month period preceding the filing of the termination petition. 23 Pa.C.S.A. § 2511(a)(1). Throughout the six months preceding the filing of the termination petition, Mother failed to show even a passing interest in Child's development. *Id.* We find this failure troubling, especially considering Child's special needs. Mother failed to exert herself to take and maintain a place of importance in Child's life, and to act affirmatively with good faith interest and effort to maintain her relationship with Child. She had no contact with Child. We find the trial court's credibility and weight determinations concerning her explanations for her lack of contact with Child

to be supported by competent evidence in the record. We, therefore, conclude that there was competent evidence to support the trial court's termination of Mother's parental rights pursuant to Section 2511(a)(1).

Next, we proceed to review whether the trial court properly determined that the requirements of Subsection (b) were satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*). This court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but pursuant to Section 2511(b), the focus is on the child. *Id.* at 1008.

In reviewing the evidence in support of termination under Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa.Super. 2008).

We note, "[t]he mere existence of an emotional bond [with a natural parent] does not preclude the termination of parental rights." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012) (some citations omitted). Also, "whether a child's primary emotional attachment is with a foster parent rather than a birth parent is a significant factor in evaluating the child's developmental and emotional needs and welfare." *Id.* (concluding that, although the child once had a bond with mother, terminating mother's parental rights best served the child's developmental, physical, and emotional needs and welfare because the child had not seen the mother in over one year and the child's primary parent-child bond lies with his foster parents). *See In re K.Z.S.*, 946 A.2d at 764 (stating "the bond between [the child] and [foster mother] is the primary bond to protect, given [the child's] young age and his very limited contact with [m]other").

In regard to her third issue, concerning 23 Pa.C.S.A. § 2511(b), Mother asserts that the trial court failed to properly consider and give appropriate

weight to the fact that no "new" familial unit would be formed by terminating Mother's parental rights for Paternal Grandparents to adopt Child. Mother argues that, by the termination of her parental rights, Child loses the potential for financial support, benefit, and inheritance from Mother's side of the family. Mother contends that the trial court also failed to adequately consider the age and physical health of Paternal Grandparents. Mother urges that Child is a pre-adolescent boy with severe special needs, and it will take physical strength to properly parent him. (*Id.* at 13.) Mother states that the trial court failed to establish how it is in the best interest of Child to terminate her parental rights, as Mother is younger and healthier than Paternal Grandparents, who have known health problems. Mother suggests that she will likely outlive Paternal Grandparents. Mother asserts that Paternal Grandparents' adoption of Child is not in Child's best interest, and thus, that the trial court should not have terminated her parental rights. (*Id.*, 22-25.)

The trial court stated the following with regard to Mother's arguments regarding Section 2511(b).

> Mother believes her chance encounter with the Child in August 2018 proves he knows that Mother is his mother and he continues to have feelings for her, but we have been instructed that, concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a

parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood. ***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

The [trial court] concludes that no meaningful bond exists between Mother and the Child. Such bond may have begun formulating during the first two (2) years of the Child's life, but it has been severed during the last ten years.

The [trial court] next specifically considered whether the Child has developed a meaningful bond with the Paternal Grandparents.

The [trial court] concludes that at this point, the Child has established a strong emotional parent-child with [the] Paternal Grandparents, who have provided stability, safety, and security regularly and consistently to the Child over an extended period of time, that is, since the Child was age two and continuing ever since.

Finally, the [trial court] is not unmindful of[,] and took into serious consideration[,] the argument of Mother's counsel that, if the adoption is granted, by law[,] the Child will be engrafted with a new parental parentage in the form of Paternal Grandparents[,] and be severed from Mother's natural family tree with all ties to that side of the family potentially being eradicated. ***Commonwealth ex rel. Dogole v. Cherry***, 196 Pa.Super. 46, 48, 173 A.2d 650, 651 (1961); ***Faust v. Messinger***, 345 Pa.Super. 155 [161, 497 A.2d 1351, 1353] (1985). Since the prospective adoptive parents are the Paternal Grandparents, who have been in the Child's life since infancy, arguably there is only a net loss and no real gain. The [trial court]

> believes, nevertheless, the case should be decided based upon the Child['s] needs and best interests, not some perceived loss [regarding] Mother's side of the family. Under the Section 2511(b) analysis, the [trial court] concludes that placement with Mother would be contrary to Child's best interests and safety needs. *In re K.Z.S.*, 946 A.2d 753, 762 (Pa.Super. 2008). "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, [856 A.2d 847, 856 (Pa.Super. 2004)] (internal citations omitted).
>
> Based upon all of the foregoing, the [trial court] concludes that it is in the best interest of the Child to terminate Mother's parental rights.

Trial court order, 3/17/20 at 17-19 (paragraph numbers omitted).

After a careful review of the record in this matter, we find the trial court's factual, credibility, and weight determinations are supported by competent evidence. *In re Adoption of S.P.*, 47 A.3d 826-827. Although there were no social workers who testified on behalf of Paternal Grandparents, the competent evidence in the record supports the trial court's conclusion that the termination of Mother's parental rights would be in the best interests of Child. The trial court did not err or commit an abuse of discretion in determining that the termination of Mother's parental rights would provide Child with permanency and stability by being adopted by his pre-adoptive Paternal Grandparents, who have had custody of him. Paternal Grandparents have provided for Child's special needs, and have provided him with safety, permanency, and security. Child has lived with Paternal Grandparents for

most of his young life, and it is they with whom he has his strong emotional bond, when compared with Mother, with whom he has had little contact because of her inability at times, and lack of desire at other times, to parent him. *See In re: T.S.M.*, 71 A.3d at 269; *In re K.Z.S.*, 946 A.2d at 764. Accordingly, for the reasons expressed by the trial court, we affirm the trial court order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/28/2020